STATE BOARD OF TAX APPEALS.

NEW YORK BAY RAILROAD COMPANY AND THE UNITED
NEW JERSEY RAILROAD AND CANAL COMPANY, THE
PENNSYLVANIA RAILROAD COMPANY, LESSEE, PE-
TITIONER, v. WILLIAM D. KELLY, STATE TAX COM-
MISSIONER OF NEW JERSEY, RESPONDENT.

CITY OF JERSEY CITY, PETITIONER, v. WILLIAM D.
KELLY, STATE TAX COMMISSIONER OF NEW JERSEY,
AND THE PENNSYLVANIA RAILROAD COMPANY, RE-
SPONDENTS.

CITY OF HOBOKEN, PETITIONER, v. WILLIAM D. KELLY,
STATE TAX COMMISSIONER OF NEW JERSEY, AND
THE PENNSYLVANIA RAILROAD COMPANY, RESPOND-
ENTS.

Decided April 25, 1944.

For the petitioner The Pennsylvania Railroad Company, *John A. Hartpence.*

For the petitioner City of Jersey City, *Charles A. Rooney* and *Joseph C. Glavin.*

For the petitioner City of Hoboken, *John J. Fallon* and *Frank P. McCarthy.*

For the State of New Jersey, *David T. Wilentz,* Attorney-General, and *Milton B. Conford,* Assistant Attorney-General.

By THE BOARD (Commissioners Harrigan, Hoff, Huegel, Sharp and Smith, concurring). Petitions of appeal filed by the City of Jersey City, the City of Hoboken and by the New York Bay Railroad Company and United New Jersey Railroad and Canal Company, the property of which is controlled and operated for railroad purposes by The Pennsylvania Railroad Company, complaining of the assessment by the State Tax Commissioner of the property of said companies, for the year 1943, have been heard together, in accordance with agreement of counsel.

The petitions set forth the following complaints:

1. The Pennsylvania Railroad Company alleges that certain of its Class II lands in Hudson County and its Class I or main stem lands on the New York Bay Railroad Company and the United New Jersey Railroad and Canal Company are assessed in excess of their true value.

2. The City of Jersey City alleges that certain parcels of Class II land of said companies are assessed at less than true value and seeks an increase thereof. Included in the petition of appeal by the city are certain Class II lands and structures as to which no complaint is made by the railroad company. Jersey City also seeks a reclassification to Class II of some of the lands of the railroad company assessed as Class I, but the board has withheld receipt of any testimony in support of this claim in order to expedite the disposition of the valuation issues at as early a date as possible and therefore this opinion will not dispose of that feature of the city appeal.

3. The City of Hoboken alleges that the Class II property, consisting of land and structures at the marine repair yard of the railroad company on the Hudson River, located in that taxing district, are assessed at less than true value and seeks an increase thereon. Although Hoboken claims that certain property classified as Class I is "improperly classified and assessed," no proof or tender of proof in support thereof has been made by the city and the same will therefore be deemed abandoned.

4. The State of New Jersey, through the Attorney-General, appears in opposition to the various grievances presented, but during the course of the hearing it was conceded by the state

that some of the property assessed requires revision of the State Tax Commissioner's values by the Board.

For the sake of clarity, our discussion of the property under appeal will be divided as follows: (1) the waterfront terminal lands in Jersey City; (2) the marine repair yard lands in Hoboken; (3) the Journal Square area lands; (4) main stem land values; (5) Jersey City structures; (6) Hoboken structures.

### 1. *The waterfront terminal lands in Jersey City.*

These Class II lands comprise the bulk of the assessed valuations in dispute between the railroad company, the City of Jersey City and the State. The railroad company seeks reductions, the city, increases, and the state, through the Attorney-General, an affirmance of the valuations assessed. The areas are known as Greenville terminal of the railroad company, some 372 acres in size and located on New York Bay; the main line or Exchange Place terminal of the railroad company on the Hudson River, some 39 acres; the Harsimus waterfront terminal tract, some 110 acres and contiguous to the Exchange Place tract at the waterfront. These two latter tracts are in effect a single assemblage, available, and actually used, in its entirety, for various railroad purposes.

The Greenville terminal is assessed at the rate of $20,250 per acre. Five qualified real estate experts for the City of Jersey City valued these lands from $25,000 to $30,000 per acre. Two qualified experts for the railroad company testified to values of $10,000 and $11,800 per acre.

The Exchange Place terminal tract is assessed at $97,000 per acre. The city experts testified to values from $117,600 to $125,000 per acre and the railroad experts appraised it at $65,000 and $69,700 per acre.

The Harsimus yard is assessed at $85,050 per acre, the values of the city experts being $117,600 to $125,000 per acre and the railroad witnesses testifying to valuations of $54,000 and $60,000 per acre.

The state has contended that the appeals both by the city and the railroad company on these waterfront tracts should

be dismissed on the basis of the counter-balancing effect of the opposing groups of witnesses, the reasonableness of the past course of assessment of these properties by the State Tax Department, the difficulty of applying as criteria of value such sales as have taken place, and the great weight which, under the various decisions of our courts, must attend the judgment of the State Tax Commissioner in the valuation of such unique properties as these, in view of his statutory right to use "his personal knowledge and judgment" in assessment of railroad property. *R. S.* 54:29A–67; *N. J. S. A.* 54:29A–67.

The authorities cited in our opinion filed in *Shelton Pitney and Walter P. Gardner, Trustees, &c.,* v. *William D. Kelly,* 21 *N. J. Mis. R.* 405; 34 *Atl. Rep.* (*2d*) 547 (dealing with the 1943 appeal of Central Railroad Company of New Jersey), the general discussion therein with respect to valuation of property having availability for railroad purposes, the references to sales and to the attitude of this board toward assessments of railroad property, generally made by the State Tax Department under the direction of Mr. Louis Focht, may all be regarded as applicable to our consideration of the specific waterfront tracts here under appeal, except as otherwise stated in this opinion. There is a wealth of legal authority dealing with the valuation for tax purposes of railroad terminal lands on the Hudson River and New York Bay, some of the cases dealing with the very property under appeal. *Long Dock* v. *State Board of Assessors,* 78 *N. J. L.* 44; 73 *Atl. Rep.* 53; *affirmed,* 79 *N. J. L.* 604; 80 *Atl. Rep.* 1135; *Long Dock Co.* v. *State Board of Assessors,* 82 *N. J. L.* 21; 81 *Atl. Rep.* 568; *affirmed,* 84 *N. J. L.* 762; 88 *Atl. Rep.* 1103; *Long Dock Co.* v. *State Board of Assessors,* 89 *N. J. L.* 108; 97 *Atl. Rep.* 900; *affirmed,* 90 *N. J. L.* 701; 101 *Atl. Rep.* 367; *Pennsylvania Railroad Co.* v. *Jersey City,* 98 *N. J. L.* 283; 119 *Atl. Rep.* 99; 125 *Id.* 921; *United New Jersey Railroad and Canal Company and Other Companies* v. *State Board of Taxes and Assessments,* 100 *N. J. L.* 131; 125 *Atl. Rep.* 335; *United New Jersey Railroad and Canal Company and Other Companies* v. *State Board of Taxes and Assessments,* 101 *N. J. L.* 303; 128 *Atl. Rep.* 427; *United*

*New Jersey Railroad and Canal Company and Other Companies* v. *State Board of Taxes and Assessments,* 103 *N. J. L.* 33; 134 *Atl. Rep.* 669; *Lehigh Valley Railroad Co.* v. *State Board,* 12 *N. J. Mis. R.* 673; 174 *Atl. Rep.* 359.

In *Long Dock Co.* v. *State Board of Assessors,* 89 *N. J. L.* 108; 97 *Atl. Rep.* 900; *affirmed,* 90 *N. J. L.* 701; 101 *Atl. Rep.* 367, a case involving the question of valuation of a railroad waterfront terminal on the Hudson River immediately north of the Harsimus terminal here under appeal, the court (at *p.* 111; 97 *Atl. Rep.* 901), summarized the valuation problem as follows:

"There were three principal questions to be practically treated: (1) what was the value of the various parcels *per se* for average business or other purposes? (2) Did they have any greater value for railroad purposes irrespective of railroad franchise, and if so, how much? (3) In connection with (2), was any greater value imparted to them because assembled into a connected whole appropriate to a railroad terminal, and if so, what? Both Messrs. Record and Hendrickson (member of the Board), as their testimony seems to indicate, testified from experience to the increment of value due to assembling and availability for special use. It is now argued that such an element of value cannot be considered and the United States Supreme Court case of *New York City* v. *Sage,* 36 *S. Ct.* 25, is relied on. But we agree with counsel for defendants that it is not on the point, for it is a condemnation case and relates to the value of an outside tract before assemblage, a very different thing from an integral part after assemblage. It is elementary that in combining two or more tracts of land for a purpose requiring both or all together, the value of the whole may well be more than the total of the parts separately. * * *"

The foregoing views were merely a restatement of prior holding of the courts. *Long Dock Co.* v. *State Board of Assessors,* 78 *N. J. L.* 44; 73 *Atl. Rep.* 53; *affirmed,* 79 *N. J. L.* 604; 80 *Atl. Rep.* 1135. In *Long Dock Co.* v. *State Board of Assessors,* 82 *N. J. L.* 21 (at *p.* 22); 81 *Atl. Rep.* 568; *affirmed,* 84 *N. J. L.* 762; 88 *Atl. Rep.* 1103, the court referred to the decision in 78 *N. J. L., supra,* as follows:

"The opinion in the case cited also held that the market value of terminal property due to the availability for railroad purposes generally was a legitimate basis for its assessment for taxation. This value the State Board has assessed in the present case. The fact that the present assessment does not greatly vary from the previous one does not involve the violation of any principle of law or show that the legal principles laid down for the guidance of the board have been disregarded. All that it shows is that in the judgment of the board the value of these terminal lands for railroad purposes generally was substantially identical with their value under a special franchise for railroad use. That is a question of fact and we cannot say that it is not so."

In *Pennsylvania Railroad Co.* v. *Jersey City*, 98 *N. J. L.* 283; 119 *Atl. Rep.* 99; 125 *Id.* 921, a case involving appeals on the very property under appeal in this case, the Court of Errors and Appeals applied the ruling in the Long Dock cases, cited *supra*, using the following language (98 *N. J. L.* 285; 125 *Atl. Rep.* 922):

"We cannot accede to the suggestion on behalf of prosecutors that 'railroad' value is not market value, nor a proper test thereof. The pronouncement of this court, in the Long Dock case, *supra* (89 *N. J. L.* 108; 97 *Atl. Rep.* 900) is to the contrary. We there said, in substance, that it was proper to consider fair value for average business; whether a greater value existed for railroad purposes, and the increment, if any, because of assemblage and consolidation of properties."

The significance of this language in the present case comes about because of the fact that neither of the real estate experts for the railroad company in this case gave any consideration, in valuing the properties under appeal, to the factor of availability or value of the property for railroad purposes. The witness Ryer stated that he had made a study of the availability of the properties under appeal for such uses to which they were adaptable. On cross-examination, however, he specifically disclaimed any attempt to take into consideration the value or availability of the property for railroad purposes. He limited his approach to the value which the properties might have for industrial or steamship purposes. The approach of the railroad witness, Stack, was the same.

All of the witnesses for the City of Jersey City said that they had taken into account the availability of the terminal property under appeal for railroad purposes, as a factor in arriving at their appraised values. Most of them gave the opinion that the value of these properties for railroad purposes was in excess of that which it might have for average industrial or business purposes. Mr. Focht also stated that in his opinion the value of these terminal lands for railroad purposes exceeded the market value which they might have for average business or non-railroad uses. This is in accord with the view of Mr. Focht's former superiors on the State Board of Assessors, Commissioners Record and Hendrickson, referred to in the excerpt from the Long Dock Co. case, in :89 *N. J. L.* 108; 97 *Atl. Rep.* 900, quoted from above.

The "true value" at which property is required to be assessed by an assessor, is that price which would be paid for the property on the assessing date in a sale between a willing seller, not compelled to sell, and a willing purchaser, not compelled to purchase, by private contract at a fair and *bona fide* sale. While properties such as the developed railroad waterfront terminals under appeal are never actually sold or purchased, the duty is nevertheless cast upon the assessor to conceive of a hypothetical sale and to assess the property for taxation at a price which requires a consideration of all of the uses to which the properties under appeal are adapted and for which they might be purchased, either as entireties, or in selected portions. We cannot imagine a use to which any of these terminals would be better adapted as entireties, than the uses to which they are now put, *i. e.*, as railroad waterfront terminals. Limited parts of the waterfront might have a greater utility for steamship purposes, if considered separately.

Counsel for the railroad company argues that the sales which have taken place indicate a great falling off of values and that the reductions in the properties under appeal, as made by the State Tax Commissioner in 1936 and 1939, are insufficient. There can be no doubt that these waterfront properties were not immune from the general real estate and industrial depression of the 1930's, and that these lands did

sustain a decline in value. The difficult and confusing question is to determine the precise extent of the decline, measured in terms of dollars.

Evidence introduced on behalf of the state shows the assessed values of the Hudson River terminals under appeal were fixed by the old State Board of Taxes and Assessment and by the courts at figures averaging a rate per acre of approximately $110,000. This rate was effective from 1924 to 1935, inclusive. In 1936, the State Tax Commissioner reduced this to $99,000 per acre and in 1939 an additional 10% reduction was made. The assessment as reduced has continued since and is reflected in the 1943 valuations. The peak of the valuation rate per acre for the Greenville terminal, in effect from 1924 to 1935, was $24,764. This, too, was the result of judicial action. Ten per cent. reductions were made by the State Tax Commissioner in 1936 and in 1939, which finally set the value at $20,250 in the latter year, and such valuation continues to be the valuation rate as of 1943.

Although many sales were cited by the railroad experts, the difficulties in attempting to analyze these sales lead to considerable confusion. In the first place, there are no sales whatsoever of any property physically comparable in extent and location, to a reasonable degree of similarity with the lands under appeal, particularly those on the Hudson River. In the second place, the extent of any decline in value at certain points on the waterfront is not reliably indicated by the sales and resales cited, because of circumstances apparently surrounding these transactions in practically every case. These circumstances affect the reliability of the comparison sales as true criteria of the true value of the property sold. They are accordingly hard to apply to the subject properties. We conclude that the determination of the extent of decline is a matter which calls for the exercise of sound and experienced judgment on the part of the valuator. Equally well informed and competent experts may honestly have the widest range of difference of opinion on this subject. The expert testimony in this case is radically conflicting. We cannot say that the judgment in this matter of the statutory assessor, the State Tax Commissioner, as reflected by the gross reduc-

tions of 19% in these valuations in 1936 and 1939 is erroneous. This seems almost inevitable because of the emphasis which has been placed by the courts upon the statutory right of the assessor of railroad property to use his "personal knowledge and judgment" in the valuation of such property. In *Central Railroad Co.* v. *State Board of Assessors,* 49 *N. J. L.* 1 (at *p.* 9); 7 *Atl. Rep.* 306, 310, the court stated:

"We do not consider that we have the right to alter or annul any of the proceedings of this body of officers, except for palpable error, for it is not to be overlooked that the statute in question expressly declares that these assessors 'shall be entitled to use their personal knowledge and judgment as to the value of the property,' a capacity with which this court is not endowed by the legislature."

In *United New Jersey Railroad and Canal Co.* v. *State Board of Taxes and Assessment,* 100 *N. J. L.* 131 (at *p.* 136); 125 *Atl. Rep.* 335, 336, the Court of Errors and Appeals referred to the statutory power of the assessor and said:

"The legislature must have intended these words in the statute to have a meaning and purpose. It is quite obvious in reading this bewildering and confusing record what that purpose was. The Board (of Assessors) should use the personal knowledge and judgment gained by experience, applying this to the evidence and to the unusual plotting and location of lands under investigation in their relation to other lands, the sale price of which is offered in evidence for comparison, and on which the opinion of expert witnesses is based."

In *United New Jersey Railroad and Canal Co.* v. *State Board of Taxes and Assessment,* 103 *N. J. L.* 33 (at *p.* 36); 134 *Atl. Rep.* 669, 670, the court said:

"The relative market value of the sales of property as evidence, compared with the value of the property under investigation, is a pure question of fact, depending almost upon an infinite variety of circumstances, and, doubtless, it was in anticipation of this situation that the legislature clothed the members of this board with the power to use their personal knowledge and judgment when fixing the value of the prop-

erty assessed, by comparing it with the sales of other property put in evidence for comparison."

These authorities are unusually appropriate in this case because of the high regard with this board and the courts have on numerous occasions expressed for the judgment and ability of Mr. Louis Focht, who, since 1898, has been directly in charge of the work of assessing railroad property under the various state boards and agencies responsible therefor since that time.

See *Central Railroad Company of New Jersey v. Thayer Martin,* 114 *N. J. L.* 69 (at *p.* 73); 175 *Atl. Rep.* 637.

The tax history of the property is a matter of some importance in a tax valuation case. *Camden County Realty Co.* v. *State Board,* 131 *N. J. L.* 132, 134; 35 *Atl. Rep.* (2d) 221; *Hackensack Water Co.* v. *State Board of Tax Appeals,* 129 *N. J. L.* 535; 30 *Atl. Rep.* (2d) 400; *Koch* v. *Jersey City,* 118 *N. J. L.* 85; 191 *Atl. Rep.* 558; *affirmed,* 119 *N. J. L.* 432; 197 *Atl. Rep.* 275; *Gannon* v. *State Board of Tax Appeals,* 123 *N. J. L.* 450, 454; 9 *Atl. Rep.* (2d) 531; *Cedar Grove* v. *State Board of Taxes and Assessment,* 12 *N. J. Mis. R.* 367; 171 *Atl. Rep.* 546; *Skouras Theatres Corp.* v. *State Board of Tax Appeals,* 123 *N. J. L.* 52, 53; 8 *Atl. Rep.* (2d) 72. We regard the tax history of the property under appeal as strongly corroborative of the correctness of the valuations of the waterfront terminal lands in this case.

Counsel for the City of Jersey City maintains that this board should hold the assessed values of the waterfront tracts to be too low because the board so held with respect to identical valuations in the appeal by the City of Jersey City of the 1939 assessments of this property. It is true that the board so held. *City of Jersey City* v. *Thayer Martin,* 20 *N. J. Mis. R.* 283; 26 *Atl. Rep.* (2d) 733. It is further true that the witnesses on both sides in this case are in agreement that there was no substantial change in the value of the properties under appeal between the assessing dates for the tax years 1939 and 1943. What the city overlooks, however, is the fact that the hearings before the board resulting in the decision increasing the 1939 assessments were concluded in

the spring of 1941. Since that time, several sales and other transactions have taken place which have furnished a broader basis for a long range estimate of New York harbor waterfront trends than was available during the period of the hearings in the 1939 case. The individual members of the board have, moreover, given much more time and attention to the study of waterfront valuation problems during the past year than prior thereto. Each annual assessment for taxation is a separate and distinct thing. *United New Jersey Railroad and Canal Co.* v. *State Board,* 103 *N. J. L.* 33; 134 *Atl. Rep.* 669. On the basis of the proof presented in this case and the various matters referred to both in this opinion and in our opinion in the 1943 Central Railroad Company of New Jersey case, *supra,* we are unable to conclude that the reductions effected by the State Tax Department in these lands in 1936 and 1939, carried forward to date, were excessive, or that they bring the 1943 assessed valuations to a point below the true value of the property as of January 1st, 1942.

The City of Jersey City also contends, in support of its request for an increase in the valuations, that the opinions of its witnesses should be given controlling weight, as only they, and not the railroad witnesses, give consideration to the value of the property for railroad purposes. The conclusion does not follow from the premise. The mere use of a correct valuation approach does not insure the soundness of the appraisal, especially where the element of personal judgment on the part of the appraiser is involved to so great an extent as in the case of this type of property. Moreover, the Jersey City witnesses, with possibly one exception, have failed to recognize that there has been a decline in the value of Hudson County waterfront. The Jersey City witness, Coffin, went so far as to state that in his opinion there had been no fluctuation in the value of waterfront property between the Jersey City-Bayonne line and Fourteenth Street, Hoboken, from 1916 to 1940. A study of all of the sales which have been cited in evidence, giving all due weight and consideration to surrounding circumstances and conditions, convinces us that this conclusion is quite untenable. It is impossible to accept the opinion of this witness as to the true value of

these properties, without substantial revision downward. To a slightly lesser extent the opinions of the other Jersey City witnesses have the same weakness.

The railroad witnesses, for their part, impair the trustworthiness of their judgment, not only by their incorrect approach to the valuation problem, discussed above, but because of their painstaking effort to avoid facing and weighing the surrounding circumstances which may affect the sales upon which they rely. There is clear evidence of a tendency, perhaps unwitting, on the part of the witnesses on both sides, to strain their judgment in the direction of support for the objectives of their employers in this case. We feel that disinterested appraisers would arrive at judgments at or close to the assessed valuations of the main terminal tracts. The assessed valuations thereof will be affirmed.

### 2. The Marine Repair Yard lands in Hoboken.

This property is a waterfront yard, approximately eight acres in area, including land under water. It is used for the maintenance and repair of marine equipment of the railroad company. It has none of the assemblage factors making for high value for railroad terminal purposes, attributable to the Jersey City properties. It has limited availability for highest type steamship uses, due to limited depth from bulkhead to pierhead line. Hoboken waterfront property generally, however, has had a highly intensive use in the past for steamship purposes because of the availability of deep water.

The property under appeal is assessed at the rate of $65,340 per acre. The City of Hoboken, in support of its appeal for an increase, has produced competent real estate witnesses who valued these lands at $78,400, $85,000 and $87,120 per acre, respectively. The railroad company witnesses in support of a claimed reduction, appraised the property at $39,600 and $34,384 per acre.

Two of the experts for the City of Hoboken appeared to give considerable weight, in arriving at their valuation of this property, to a steamship lease made in 1919 of nearby property owned by the Hoboken Land and Improvement Com-

pany. This lease is of very little probative weight for the reasons given by the board in its discussion of the same evidence, when previously given by one of these witnesses, in *City of Hoboken* v. *Hoboken Land and Improvement Co., N. J. Tax Reports,* 1934-1939, *p.* 557 (at *p.* 560).

The opinions of the railroad witnesses on this property are weakened by the full weight and credit which they give to the General Foods sale, and to the sale of Plot 5 of the Hoboken Land and Improvement Co. (also known as Plot Y), from Hoboken Terminal Properties, Inc., to Hoboken Land and Improvement Company, in 1932. The two sales mentioned are of adjoining lands almost immediately to the north of the property under appeal. As to the Plot Y sale, this board has twice already decided that the circumstances surrounding that transaction impair it as a criterion of value. *Hoboken Land and Improvement Co.* v. *City of Hoboken, N. J. Tax Reports,* 1934-1939, *p.* 150 (at *p.* 153) ; *City of Hoboken* v. *Hoboken Land and Improvement Co., Id., p.* 557 (at *p.* 558). The evidence taken in the present case accords with that which led the board to the conclusion stated in the cases cited. The railroad witness, Ryer, testified that he regarded the Plot Y sale as a free and open sale, free of any consideration other than the purchase price. But upon cross-examination he admitted that he had previously testified that there were other considerations attached to the transaction, but explained that in his opinion such other circumstances had not affected the purchase price of the property. As to the General Foods sale, see our opinion in 21 *N. J. Mis. R.* 405 (at *pp.* 416, 417) ; 34 *Atl. Rep.* (2d) 547. The refusal of the railroad witnesses to recognize the deficiencies in these sales and their readiness to accept them at the face value of the stipulated sales price, must operate against the weight to be accorded their appraisals of the Hoboken property under appeal.

The railroad witness, Ryer, also cites as confirmatory of his valuation of the property under appeal, the sale, on October 6th, 1943, of eighteen acres of waterfront land, including Plots 5 and 6, from the Hoboken Land and Improvement Company to Bethlehem Steel Company for $850,000, or

approximately $45,000 per acre. On cross-examination, however, it was brought out that simultaneously with this conveyance three separate leases were executed from the Hoboken Land and Improvement Company to the Bethlehem Steel Company for Piers 14, 15 and 16, on Plot No. 7. The Steel Company had been in possession of the property purchased, as well as of the property leased, for sometime before, and was using same in the construction of ships for the United States Government. Possession had been obtained by the government under its power of eminent domain. The negotiations which culminated in the transactions just referred to might have resulted in the condemnation by the United States government of both the property sold and that leased. Such a result would have removed the properties from the tax rolls of the city and thus increased the real estate tax burden of the land company, it being by far the largest taxpayer in the city. The seller in this transaction can in no sense be regarded as being a willing seller. *Curley* v. *Jersey City,* 83 *N. J. L.* 760; 85 *Atl. Rep.* 197. The simultaneous negotiation and consummation of the lease transactions is also necessarily a factor which must be considered before it can be safely concluded that the sales price for the parcel conveyed was the only motivation or consideration moving the seller to sell. *Cf. City of Hoboken* v. *Hoboken Land and Improvement Co., supra* (at *pp.* 558, 559).

As stated in our opinion in the 1943 Central Railroad Co. case, *supra* (21 *N. J. Mis. R.* 405; 34 *Atl. Rep.* (2d) 547), no sale or transaction should be ignored, but all should be given due weight, in the light of the differences in physical character and location between the property sold and that under appraisal, and of all circumstances surrounding the sale which might have induced the parties to fix a price at less or more than if such circumstances were not present. This may be very difficult to do in many cases, but the board must exercise its best efforts in that behalf, as must any appraiser.

The tax history of this Hoboken yard is corroborative of the soundness of the 1943 valuation. As in the case of the Jersey City waterfront properties, the assessed valuation of

this parcel was reduced in 1936 and in 1939. The rate per acre was arrived at after considering sales and also the judgment of the Supreme Court of this state in reducing the assessed valuation of Plot 4 of the Hoboken Land and Improvement Company, immediately south of the property under appeal, to a valuation rate of $65,340 per acre for the tax years 1935 and 1936. This judgment was rendered in September, 1938, and the State Tax Commissioner had same before him and also the then very recent General Foods sale, in determining the extent of his 1939 reduction of waterfront values in the neighborhood of Hoboken, including the specific properties under appeal.

Counsel for the City of Hoboken urges that the assessed valuation under appeal should be increased because of the determination by the Supreme Court, in and by the same judgment referred to above, that valuations of other nearby waterfront properties of the Hoboken Land and Improvement Company, fixed by the State Board of Tax Appeals at $74,052 per acre, should be affirmed for 1935 and 1936. The Supreme Court not only reduced Plot 4 to $65,340 per acre, but reduced Plot 7 to $63,162 per acre. The map offered in evidence by the state, showing all of the Hoboken properties to which we have referred, indicates that Plot 4 of the Hoboken Land and Improvement Company is contiguous to and more nearly comparable with the property under appeal, considering both proximity and extent of backland, than any of the other waterfront properties of the Hoboken Land and Improvement Company. Since it was the State Tax Commissioner's judgment that a general reduction should be effected on Hudson County waterfront for the year 1939, and as we have already decided that such a reduction was not improper in view of the tax history and valuation trend of Hudson County waterfront, we are unable to quarrel with the Tax Commissioner's acceptance of the reduced valuations of nearby property made by the Supreme Court, rather than its affirmances of higher valuations for other nearby properties. The acceptance of the latter as controlling would have led to no reduction at all in 1939 of the property under appeal. It is the consensus of opinion of the experts that

Hoboken waterfront has not materially changed in value since 1939, and therefore, 1939 valuations having been carried forward to date, we conclude that they are proper and they will be affirmed as representative of the true value of these lands.

### 3. The Journal Square Area.

Included within the petition of appeal for an increase by the City of Jersey City, is a long, irregularly shaped parcel of land aggregating some eleven acres, taking in the railroad company's cut through Journal Square and the embankments and scattered portions of the upper ground on the lips of both sides of the cut. The railroad company has not complained of the assessed valuation of this parcel, which is at the rate of $36,813 per acre. Three Jersey City witnesses valued the property at from $150,000 to $174,000 per acre. The railroad experts agree upon a valuation of $43,500 per acre for this tract. It seems apparent from these appraisals that the assessed valuation is too low, and the State Tax Commissioner concedes that it should be revised.

The valuations of each of the witnesses, on both sides, represent average appraisals, arrived at after dividing the tract up into many separate parcels, of varying character and value, and giving each a separate valuation. The witness, Coffin, for example, values segments of this tract at from $45,000 to $500,000 per acre. The latter valuation is ascribed to a parcel of 1.59 acres which includes the location of the Journal Square station of the Hudson and Manhattan Tubes. The valuation of the city experts appear to be predicated upon the potential air rights of this property, involving a contemplated project for the erection of a multi-storied office building above the Journal Square station. Such a project has been considered in the past and the station has been built with provisions for the subsequent erection of a building of that character. However, a consideration of a potential development as remote as such a project now appears to be is not a lawful basis for the valuation of lands. Property must be assessed in the actual condition held by

the owner thereof. *Stevens Institute* v. *State Board of Taxes and Assessment,* 105 *N. J. L.* 99; 143 *Atl. Rep.* 356. The present condition of this property suggests that its utility is far better for the railroad uses to which it is now being put than for any such speculative project.

On the other hand, one should not disregard the values of certain portions of the upper level of this tract in the Journal Square vicinity, as indicated by their suitability for profitable non-railroad and purely commercial purposes. The appraisals of the railroad experts seem to have disregarded this factor. They are also subject to the weakness that they have also disregarded the factor of value for railroad purposes, a factor which is of primary significance in determining the value of this particular parcel, because of its physical character as a whole, fitting it for practically no other use. After considering all of the proofs it is our judgment that the true value of this parcel, taken as a whole, is $60,000 per acre, and the valuation thereof will be revised accordingly.

*4. Main Stem Land Values.*

The contest in this regard is between the railroad company and the state, the taxing districts having no interest in the assessed valuation of Class I property. Most of the lands affected by this part of the railroad company's petition of of appeal are situated in Jersey City, but some are on the New York Bay Railroad Company line in Bayonne. A substantial amount of this property is in the terminal areas. All of the witnesses agree with the State Tax Commissioner that main stem land valuations should be the same as those in terminal areas through which the main stem runs. It follows accordingly from our affirmance of the Class II terminal land values that the main stem lands within the terminals, assessed at the same rates per acre, should likewise be affirmed.

As to main stem areas situated outside the borders of the terminals, our conclusion is, again, that, with several exceptions which will be noted hereinafter, the valuations should be affirmed. The opinion evidence in support of general

reductions on main stem, given by the railroad witnesses Ryer and Stack, is met by the state with the testimony of three qualified appraisers, whose valuations generally are considerably in excess of the assessments made by the State Tax Commissioner. The valuation approach of the witnesses for the railroad company has the same weakness as discussed above in treating Class II valuations. We refer to the express failure to attempt to reflect the factor of availability for railroad purposes. This legal flaw affects the weight of the appraisals of the railroad witnesses on main stem values even more than on the waterfront terminals. While the latter have high utility for steamship, commercial and industrial purposes, as well as for railroad purposes, it is apparent that most of the main stem lands have an obviously and substantially greater value for railroad purposes than for non-railroad uses. The main stem is the right-of-way of the railroad company, 100 feet in width, and extending from terminus to terminus. Some of it is on filled elevations and other parts are in cuts. The assemblage of these properties is designed mainly to serve the intended use of the property for the purposes of a going railroad company right-of-way. The railroad witnesses in this case specifically asserted that they were valuing these properties from the standpoint only of what they would bring if the railroad company discontinued railroad operations and threw the parcels, in their existing condition, on the market for general commercial and industrial uses.

As we see it, this approach cannot help but to artificially depress the appraised value of the property. The disregard of the value of the property for railroad purposes has been held to be improper by the courts. *Central Railroad Company of New Jersey* v. *State Board of Assessors*, 49 *N. J. L.* 1, 5; 7 *Atl. Rep.* 306; *Central Railroad Co.* v. *Thayer Martin*, 114 *N. J. L.* 69, 75; 175 *Atl. Rep.* 637, and see the other authorities, cited *supra*, in connection with the discussion of waterfront terminal land values. The judgment of the State Tax Commissioner, always entitled to great weight, is particularly important in the valuation of property such as main stem lands, the "railroad" value of which is most peculiarly

a matter for the trained and experienced judgment of the assessing officials who include railroad engineers.

We find, however, that the testimony of the real estate witnesses is so far from supporting the assessed valuations of the State Tax Commissioner as to some of the main stem lands, i. e., on the United New Jersey Railroad and Canal Company in Jersey City, from Washington Street to Warren Street, from Henderson Street to Varick Street, and on the Harsimus Cove connection from its beginning to Washington Street, that revision of such valuations downward is clearly required. Our judgment as to the assessments requiring reductions is reflected in the schedule at the foot of this opinion. In other respects we find the main stem land valuations not to be in excess of the true values of the property and they will be affirmed.

### 5. Jersey City Structures.

The City of Jersey City petitions for an increase in the assessed value of Piers D and F, appurtenant to the Harborside warehouse project at the Exchange Place-Harsimus terminal yard. The proof given by the city consists of the testimony of an engineer, giving quantitative estimates of reproduction cost less depreciation, as of January 1st, 1942, and the opinion of Mr. John J. Mantell, who was qualified as a real estate expert for the purpose of valuing these piers. The construction of Piers D and F was completed in 1931. Pier D is assessed for the tax year 1943 by the State Tax Department at $663,510, and Pier F at $848,997. The Jersey City construction witness gave a reproduction cost for Pier D of $2,112,451, and a "sound value" after depreciation of $1,763,323; and for Pier F the figures were, reproduction cost, $3,014,750 and "sound value" after depreciation, $2,500,344. The weaknesses of reproduction cost less depreciation as evidence of market value of a structure are well known. *Central Railroad Co. v. State Board of Assessors, 49 N. J. L. 1; 7 Atl. Rep. 306; Turnley v. Elizabeth, 76 N. J. L. 42; 68 Atl. Rep. 1094.* In *City of Jersey City v. Seaboard Terminal and Refrigeration Co., 19 N. J. Mis. R.*

178; 17 *Atl. Rep.* (*2d*) 577, 588, however, this board stated the following, in a case involving the true value of a warehouse structure without the land:

"Petitioner's proofs were primarily based upon depreciated replacement cost of the building, both from the standpoint of cubic foot units and of detailed quantity survey. While proof of this character, disassociated from the selling value of the property, is ordinarily of low probative value, *Central Railroad Co.* v. *State Board* (*Supreme Court*, 1886), 49 *N. J. L.* 1; 7 *Atl. Rep.* 306; *Turnley* v. *Elizabeth* (*Supreme Court*, 1908), 76 *N. J. L.* 42; 68 *Atl. Rep.* 1094; *Schetty* v. *City of Jersey City* (*State Board,* 1940), 18 *N. J. Mis. R.* 37; 11 *Atl. Rep.* (*2d*) 18, yet where structures of unique character, not usually sold in the real estate market, are involved, as here, resort to consideration of the physical constituents of the building and their cost may be justified. *Ranck* v. *City of Cedar Rapids,* 134 *Ia.* 563; 111 *N. W. Rep.* 1027. Conclusions thus arrived at are to be qualified, however, by such evidence as is available as to whether a prudent operator would make the expenditure as of the assessing dates."

We have recently referred to the unreliability of reproduction costs based upon the abnormally high price conditions obtaining on January 1st, 1942, the assessing date, *Shelton Pitney and Walter P. Gardner* v. *State Tax Commissioner, supra* (1943 Central Railroad of New Jersey case). We are moreover, not fully content with the amount of depreciation which has been allowed by this witness in arriving at "sound" value, particularly on machinery and electrical equipment in the structures, of which the witness appeared to have very little first hand knowledge.

The approach of the real estate expert, Mantell, destroys his appraisal entirely. While his testimony was offered on the basis that he would arrive at a residual value for the structures, after deducting his land values from his market value of the parcel of real estate as an entirety, land and structures, it nevertheless appeared, upon cross-examination, that what the witness had actually done was to take his land value, add thereto a structure value independently arrived

at upon the basis of reproduction cost, and then deduct the land value in order to arrive at the final value of the structures. This, in effect, was a valuation of the piers on the basis of their depreciated reproduction cost, in the manner of a construction or building expert, an approach for which this witness was not qualified at the hearing.

The most important evidence in this case bearing upon the soundness of the assessed valuations of these piers consisted of the showing that the assessment thereof by the State Tax Department, since the construction of these structures in 1931, has been based upon a depreciation of certain figures which the department has always understood to represent the original cost of these piers. These cost figures were reported by the railroad company to the State Tax Department at $947,873 for Pier D and at $1,212,854 for Pier F. Although originally suspicious of the accuracy of these figures, Mr. Focht testified that he accepted them as representing the "value new" of the property, after assurance as to their correctness by the railroad representatives at the time, and because of his inability to procure the original plans of the piers for purposes of checking. The piers were originally assessed at 80% of the cost new as reported by the company, and, for the year 1943 have been assessed at 70% of such cost. During the hearing of the present case, the cost figures upon which the State Tax Department had been relying were shown to be substantially less than the true cost figures, by the testimony of an assistant to the chief engineer of the railroad company who stated that the original costs, exclusive of dredging and clearing of old buildings, were $1,749,491 for Pier D and $1,830,255 for Pier F. Upon being apprised of this testimony, Mr. Focht testified that in his opinion, assuming the correctness of the cost figures just stated, a revision upward of the assessed value of these structures was definitely necessary. It seems to us obvious that that is so.

In revising the valuation of these structures, we have given consideration to the figures of original cost as now furnished by the railroad employee, to the reproduction cost minus depreciation, as testified to by the Jersey City engineering expert, although to a much lesser degree, and in addition to

two other factors, as to one of which there was considerable controversy at the hearing.

The controversial factor was a claim by the railroad company of obsolescence because these piers were built without "apron tracks" on either side to facilitate the cheap handling of both box car and open car freight, from rail to ship and *vice versa*. The practicability or necessity for such apron tracks on railroad piers in New York Harbor is made a matter of some doubt by the cross-examination of the witness offered to establish this feature of asserted obsolescence on behalf of the railroad company. While the extent of the factor of obsolescence based on the absence of apron tracks is difficult to judge, we have nevertheless given some weight to that factor in determining the true value of these piers.

Finally, it was established, and not contradicted, that there has been some settlement in the outer ends of each of these piers caused by piling of insufficient length. We have therefore also given this factor some weight as bearing upon the extent of depreciation. Our conclusion is that the true value of Pier D was $700,000, and of Pier F $1,000,000, on the assessing date, and the assessed valuations will be revised to conform thereto.

### 6. Hoboken Structures.

The City of Hoboken seeks an increase in the assessed valuation of certain structures, including four small piers, situated at the marine repair yard of the railroad company in that city. Its proof in support of its claim consists of the estimate of reproduction cost minus depreciation of a builder witness, who made cubic foot and not quantitative estimates. It appears that all of these structures were erected prior to 1905, and, excepting three of the four piers, are substantially the same structures as when constructed, except for age. We have carefully considered the testimony of this witness and believe that his allowance for depreciation and obsolescence has been uniformly inadequate. Any normal allowance of straight line annual depreciation would eliminate any value in the structures, and such approach is therefore not permissible, since all of these structures are in use

and have a taxable value. Considering both physical depreciation and obsolescence, we are of the opinion that the assessed valuations of the structures listed in the petition of appeal, excepting Piers P, Q and R, are not less than the true value thereof, and they will be affirmed.

As to Piers P, Q and R, it is proven, and not denied, that substantial portions thereof were reconstructed during the year 1941. While the railroad company describes the work done as repairs, we find from the testimony offered through the State Tax Department employees that the work done on the said piers was of such magnitude as materially to change the expected life and character of these structures. We have therefore concluded that the assessed valuation thereof should be revised upward and their true value is determined as follows: Pier P, $17,600; Pier Q, $22,700; Pier R, $32,600.

At the hearing, counsel for the City of Hoboken was given permission to amend the city's petition of appeal so as to claim the non-assessment of certain structures found on the premises by the city's expert and not included in the official list of structures assessed by the State Tax Department. While there was general proof on behalf of the railroad company and of the State Tax Department that there were no structures on the premises other than those listed in the assessment, we do not believe that the rebuttal has overcome the specific and factual testimony of the city expert who testified that he actually found these additional structures and testified to reproduction cost and "sound" values therefor. While we are not fully convinced that the estimate of "sound" value for these structures is representative of their true value, we have no choice but to accept the proof as such, there being no other figures before us which we can use in determining their value. It is our determination, therefore, that the assessment of structures of the railroad company on its marine repair yard in Hoboken, should be amended to include, in addition to the items hitherto assessed, the following:

| Item | True Value |
| --- | --- |
| Repair Shop (16' x 25') | $100 |
| Cordage Stores | 500 |

Iron Stores, second building .................... 700
Boiler Shop, Engine Room (50′ x 37′) ......... 4,800

We suggest an investigation of these structural items by the State Tax Department, as we are not satisfied beyond a doubt that one or more of them may not already be included in the official assessment list. Under the proofs, however, we have had no alternative than to make the foregoing determination.

Certain miscellaneous parcels of lands in Jersey City, other than those referred to above, have, in our opinion, required revision in valuation, upon the basis of the testimony of all the witnesses. We append herewith a full list of all the assessed land items which we have determined as requiring revision so as to be in accord with true value. All land assessments other than those set forth in this list are affirmed.

### LANDS

| Item | Area | Rate per acre | True value |
|------|------|---------------|------------|
| 57 ............. | 1.056 | $190,000 | $200,640 |
| 42 ............. | .881 | 50,000 | 44,050 |
| 24 ............. | .270 | 40,000 | 10,800 |
| 23 ............. | .267 | 43,560 | 11,630 |
| 22 ............. | .350 | 43,560 | 15,246 |
| 21 ............. | .164 | 190,000 | 31,160 |
| 20 ............. | .194 | 190,000 | 36,860 |
| 56 ............. | 2.639 | 100,000 | 263,900 |
| 34 ............. | .630 | 100,000 | 63,000 |
| 18 ............. | .955 | 100,000 | 95,500 |
| A ............. | 5.600 | 25,000 | 140,000 |
| B ............. | .094 | 25,000 | 2,350 |
| C ............. | 11.079 | 60,000 | 664,740 |
| E ............. | .167 | 25,000 | 4,175 |
| 9 ............. | .172 | 20,000 | 3,440 |
| 13 ............. | 1.356 | 17,500 | 23,730 |